IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

LAMAR FLYNN, )
)
    Plaintiff, )
)
v. ) CIVIL ACTION NO. 00-JEO-0169-W
)
SERGEANT TCHERNAVIA ARCHIE, )
)
    Defendant. )

**ENTERED**
**FEB 17 2004**

## MEMORANDUM OPINION

Plaintiff Lamar Flynn (hereinafter "the plaintiff" or "Flynn") filed this action on January 20, 2000, alleging various claims against numerous defendants.[1] Specifically, he alleges that while he was waiting to begin his work assignment for the day, defendant Sergeant Tchernavia Archie Blackmon (hereinafter "the defendant" or "Archie")[2] approached him regarding the fact that he had a beard. (Doc. 1). Flynn further alleges that Archie knew he was permitted to have a short beard due to a skin condition; however, she stated that she was going to write a disciplinary notice concerning the plaintiff's violation of the institution's beard policy. An altercation resulted with the plaintiff being pushed by Archie. Thereafter, Archie ordered the plaintiff shaved. As a consequence thereof, he states he experienced significant pain.

On March 26, 2003, the court denied the plaintiff's motion for summary judgment. (Doc. 30). After considering the plaintiff's allegations, the court determined that there were factual disputes on the plaintiff's excessive force claim warranting a trial and further consideration.

---

[1] It is noted that all of the plaintiff's claims against the other defendants and all of the plaintiff's claims against defendant Archie with the exception of those discussed herein were dismissed on August 16, 2002. (Doc. 28).

[2] Archie is now a lieutenant with the Department of Corrections and her full name now is Tchernavia Archie Blackmon.

(Doc. 28). The parties consented to the jurisdiction of the undersigned magistrate judge to try this case on the merits. The case was tried without a jury on February 10, 2004.[3]

## I. DISCUSSION

### A. The Testimony

#### 1. Calvin Mays

The plaintiff's first witness was Calvin Mays. By his admission, he witnessed only a portion of the incident between the plaintiff and Archie. Specifically, he stated that when he was walking out of the institutional kitchen on the morning of November 10, 1999, he heard the plaintiff and Archie in "disagreement." He could not recall the content of the discussion other than that he heard Archie tell the plaintiff to go to the shift office. Mays stated that the plaintiff and Archie were "face-to-face" at this point. He then observed Archie push the plaintiff. Other inmates separated them by holding the plaintiff back. According to Mays, there were about ten inmates in the immediate area at the time. These inmates were on the "M Squad" because of their violation of institutional rules involving indecent exposure.

After the plaintiff and Archie were separated, the plaintiff went to the shift office as directed by Archie. Mays noted no disrespectful conduct by the plaintiff.

#### 2. James Rodgers

James Rodgers also was assigned to the "M Squad." He also saw Archie push the plaintiff. He then stated that he stepped between them to avoid further contact. The plaintiff then left the area to shave. He admitted that he had been written-up by Archie in the past for disciplinary violations. He also stated that later that day, during the afternoon, he saw the

---

[3] Neither party to this matter requested trial by jury.

plaintiff in "C-Dorm." According to Rodgers, the plaintiff's face had welts on it. Rodgers also stated that at the time of the incident, the plaintiff's beard was longer than it was at the trial of this matter.

### 3. The plaintiff

The plaintiff testified that on the morning in question, at about 8:35 a.m., Archie told him that she was going to give him a disciplinary write-up because his beard violated the institutional policy.[4] Upon hearing this, he stated to Archie that he was going to the shift office. Archie then grabbed his arm and shoved him in the chest. The plaintiff then stated, "I got you." It was at this time that another inmate, Roderick Hollis, stepped between them. According to the plaintiff, Archie pushed Hollis out of the way and then grabbed, jerked, and pushed him. When they got to the office, Archie went inside to talk to Sergeant McMillan. The plaintiff was then taken inside, placed in a chair, and cuffed. An inmate barber was summoned. He came into the room. Archie stated that she wanted to shave him. The plaintiff refused to submit and he started to get up. Archie sat him down and the barber then shaved his beard. According to the plaintiff, Archie told the barber to lower the shaver to the lowest level. As a result of the shaving, the plaintiff's skin reacted with a rash and welts.

Archie and another guard took the plaintiff to the infirmary where he was seen by at least one nurse. The plaintiff states that one of the nurses wanted to do an EKG test on him, but Archie did not allow the same. He was then taken to the segregation unit. He was given something for his skin after he arrived in the unit.[5] He said that because his face hurt he had to

---

[4] The plaintiff denied that he had been told by Archie the day before to shave before he returned to work.

[5] The plaintiff stated that he was given Benzoperoxide.

3

sit up in the corner of the room to rest.

The plaintiff was later found guilty of the institutional violations of failing to obey a direct order and insubordination.

On January 10, 2000, the plaintiff was walking down the sidewalk at the institution when he passed Archie. She then pushed him off the sidewalk. According to the plaintiff, he was told by Archie to file another lawsuit about it.

The plaintiff further testified that he had always been compliant with the institution's shaving profile; however, during the testimony, he demonstrated for the court that his perception of the 1/8" requirement was perceived to be about 1/4." He also stated that he did not like the defendant's ways. He felt that she did not respect him.

The plaintiff also stated that Rodgers did not see him as he testified to earlier because the plaintiff did not go back to C-Dorm. He was placed in the segregation unit. He did see Rodgers from a distance after he (the plaintiff) left the infirmary shortly after the incident.

### 4. Linda Shipman

Linda Shipman testified that she is a Health Service Administrator with the Department of Corrections. Although she was not at the institution at the time of the incident, she was familiar with the medical procedures and records that were in use at that time. Specifically, she was familiar with the "SOAP" procedure used for evaluating inmates that involved listening to the subjective complaint of the inmate, observing the situation, assessing the patient's needs, and deriving a plan of action.

Shipman reviewed the plaintiff's medical records, which showed that on the date in question, he went to the infirmary, was examined, and no further action was indicated. (Def. Ex.

2). The records further show that his vital signs were normal. According to the medical sheet, the plaintiff stated to the examining nurse that he was "fine." (*Id.*). The sheet also shows that the plaintiff was not in any distress and that he had no visible injuries.

Shipman also discussed the plaintiff's shaving profile that allowed him to have a limited beard (1/8" inch) only on the lower portion of his cheeks. (Pl. Ex. 1).

### 5. Defendant Archie

The defendant testified that she has been a corrections officer for 19 years. She was a supervisor on the day at issue. The day before the incident, Archie told the plaintiff not to return to work without shaving. The next day, he returned without shaving. The beard was longer than the 1/8" inch maximum.

The plaintiff and Archie were about five feet apart when they started discussing the situation. The plaintiff drew closer and eventually was close enough that his saliva was striking Archie's face as he was talking. He was complaining that she was " messing with him." Because he was within her "safe distance," she pushed him away from her. Other inmates moved between them. Archie was concerned by this because she did not have her baton or radio with her at this juncture and one of the inmates, Roderick Hollis, appeared to be seizing the opportunity. She told him to "get off of me and don't ever touch me again." She estimated that there were about 10 to 15 inmates in the immediate area. She sent the plaintiff to the shift office. The plaintiff was acting appropriately during his work to the office until they reached the laundry area. At that point, the plaintiff started up again, making threats. He said "you think you go for bad, you can't whoop me." At that point he turned and she again ordered him to go to the office. She pushed him toward the office, encouraging him to move.

When they arrived at the office, she talked to Captain Thomas about what had happened. Thomas directed her to have an inmate barber come and shave the plaintiff. Sergeant McMillan was also in the office. They discussed the situation as well. McMillan agreed that the beard was not within prison regulations. The barber was called and the plaintiff was shaved.

Archie denies attempting to personally shave the plaintiff or ordering the barber to place the shaver on the lowest level. She also denies taking the plaintiff to the infirmary or preventing the medical staff from conducting an EKG. Archie states that the plaintiff was escorted to the infirmary by Officer Wheeler. She further denies telling the nurse not to perform the EKG or otherwise restricting the treatment of the plaintiff. Finally, she denies pushing the plaintiff off the sidewalk in January or threatening him in any matter at that point.

The plaintiff was written up by Archie for insubordination and failure to obey a direct order. She attended the disciplinary hearing.

### B. The Law

The Eighth Amendment prohibition against cruel and unusual punishment is triggered when a prisoner is subjected to an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 1084, 89 L. Ed. 2d 251 (1986). The Supreme Court held in *Hudson v. McMillan*, 503 U.S. 1, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992), that "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishment Clause, the core judicial inquiry [in determining whether a prisoner has suffered unnecessary and wanton pain] is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.*, 503 U.S. at 7, 112 S. Ct. at 999. *See also Skrtich v. Thornton*, 280 F.3d 1295,

1300-01 (11th Cir. 2002); *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999); *Harris v. Chapman*, 97 F.3d 499, 505 (11th Cir. 1996). In extending *Whitley* to all cases involving allegations of force, the Supreme Court reasoned:

> Many of the concerns underlying our holding in *Whitley* arise whenever guards use force to keep order. Whether the prison disturbance is a riot or a lesser disruption, corrections officers must balance the need "to maintain or restore discipline" through force against the risk of injury to inmates. Both situations may require prison officials to act quickly and decisively. Likewise, both implicate the principle that "'[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'"

*Hudson*, 503 U.S. at 6-7, 112 S. Ct. at 998-99 (citations omitted). With these concerns in mind, the Court set out certain factors that should be considered in evaluating whether the use of force was unnecessary and wanton. They include (1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the threat reasonably perceived by the prison official, (4) any efforts made to temper the severity of a forceful response, and (5) the extent of the injury suffered by the inmate. *Hudson*, 503 U.S. at 7-8, 112 S. Ct. at 999. *See also Skrtich*, 280 F.3d at 1300-01. The Court made it clear that the extent of injury suffered by the inmate is only one of the many factors which should be considered, but not necessarily a decisive one, when it said, "[t]he absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Hudson*, 503 U.S. at 8, 112 S. Ct. at 999.

In resolving the conflicts presented in this action, the court must also keep in mind the Supreme Court's admonition that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Hudson*,

503 U.S. at 7, 112 S. Ct. 995 (quoting *Whitely*, 475 U.S. at 321-22, 106 S. Ct. 1078 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979))). However, "[t]he use of force must stop when the need for it to maintain or restore discipline no longer exists." *Skrtich*, 280 F.3d at 1303 (citing *Whitley*, 475 U.S. at 320-21, 106 S. Ct. at 1078).

Concerning the decision to shave the plaintiff following the altercation, the issue is whether the defendant wantonly acted with the intent to inflict unnecessary pain. *See Wilson v. Seiter*, 501 U.S. 294, 297, 111 S. Ct. 2321, 2323, 115 L. Ed. 2d 271 (1991); *see also Bell*, 441 U.S. at 535-39, 99 S. Ct. 1861.

### C. Analysis

#### 1. The shoving incident

Examining the first aspect of the plaintiff's allegations, that the defendant used excessive force in handling him, the court finds: (1) that the circumstances, including the fact that the plaintiff was extremely close in proximity to Archie, warranted her decision to push the plaintiff away from her; (2) the amount of force was reasonable under the circumstances, particularly since she did not have a baton or radio on her person at that moment;[6] (3) Archie was reasonably troubled by the plaintiff's proximity and reaction to the situation under the circumstances; (4) the shoving was of limited force and duration; and, (5) the injury suffered by the plaintiff was minimal, even in light of his personal situation that included a previous stab wound to the chest that made that area of his body more sensitive than in the usual circumstance.

The shoving and subsequent grabbing with an intent to move him along to the office do

---

[6] The need for immediate action, such as pushing the plaintiff, is further demonstrated by the fact that there were other inmates in the immediate vicinity. Although at least one inmate, Rodgers, stepped in to separate them, the defendant could not have been certain of the intentions of all the other inmates at the instant the events unfolded.

not constitute the kind of injury the Eighth Amendment prohibition against cruel and unusual punishment is intended to prevent. To so find would unjustifiably cause this court to intrude, using hindsight, on a matter of prison administration not rising to a constitutional dimension.

### 2. The shaving incident

Construing the plaintiff's allegations liberally as this court is required to do, concomitant with the plaintiff's Eighth Amendment excessive force claim is the assertion that the defendant caused him to be shaved in a manner that was intended to cause and, in fact, caused him pain. Reviewing the totality of the record, the court finds that the evidence fails to show that the defendant acted with the requisite malicious and sadistic intent to cause harm. The complained-of conduct does not rise to the level of an Eight Amendment violation.

It is evident from the evidence that the plaintiff believes that the defendant did not respect him or his situation. That, however, does not amount to a constitutional violation. After examining all of the evidence, including the contradictory testimony of the various witnesses, the court is convinced that the plaintiff has failed to meet his requisite burden of proof for a number of reasons. First, inmate Mays' testimony is of little assistance since he witnessed only a small portion of the relevant events and none of the circumstances surrounding the shaving incident in the office. Second, inmate Rodgers' testimony also is limited with regard to the duration of the events observed and is necessarily suspect because, contrary to what Rodgers stated about seeing welts on the plaintiff's face in C-Dorm that afternoon, the plaintiff acknowledged that he did not return to C-Dorm and was not seen by Rodgers that afternoon. Additionally, the evidence shows that Rodgers was biased against Archie premised on past encounters and disciplinary incidents involving her. Third, the credible evidence, including the medical records, does not demonstrate

9

an injury of constitutional dimension.

### 3. Retaliation claim

To the extent that the plaintiff's allegations and his evidence at the hearing include a retaliation claim, the court finds that the evidence is insufficient to state a claim. At worst, the evidence demonstrates that in January 2000, the defendant pushed the plaintiff and that resulted in his being moved off the sidewalk.

"It "'is well established that an act in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for different reasons, would have been proper.'" *Howland v. Kilquist*, 833 F.2d 639, 644 (7th Cir. 1987) (quoting *Buise v. Hudkins*, 584 F.2d 223, 229 (7th Cir. 1978))." *Kmetz v. State Historical Society* (*Wisconsin Historical Society*), 2004 WL 225539, *14 (W.D. Wis. Feb. 3, 2004). However, there must be sufficient adverse treatment to state a claim. The court finds that the plaintiff's evidence is insufficient to show an actionable adverse action.

## II. CONCLUSION

The plaintiff had the burden of proof in this matter and he has failed to convince the court that the defendant exerted excessive force or that she acted with the necessary intent to warrant relief. Judgment is therefore due to be entered in favor of the defendant. An order consistent with this court's findings will be entered.

The Clerk of the Court is **DIRECTED** to serve a copy of this memorandum opinion and the accompanying order upon the plaintiff and counsel for the defendant.

**DONE**, this ____ day of February, 2004.

_____

**JOHN E. OTT**
United States Magistrate Judge

11